692 So.2d 1258 (1997)
B. BENNETT MANUFACTURING COMPANY, INC.,
v.
SOUTH CAROLINA INSURANCE COMPANY.
No. 96-CA-731.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 1997.
*1259 Michael K. Fitzpatrick, Nancy Comartie, New Orleans, for Defendant/Appellant.
Paul L. Katz, Covington, for Plaintiff/Appellee.
Before BOWES, GRISBAUM and WICKER, JJ.
WICKER, Judge.
This case involves a fire claim on an insurance policy. The defendant insurer appeals a jury verdict which found it liable for the plaintiff's claim for fire damages and awarded penalties and attorney's fees against the insurer. We affirm.

STATEMENT OF THE CASE
On January 13, 1993 B. Bennett Manufacturing Company, Inc. (hereafter Bennett) filed suit against its insurer, South Carolina Insurance Company (hereafter SCIC), for failure to pay a claim arising out of a September 21, 1992 fire at the Bennett warehouse. *1260 Bennett alleged it had presented its proof of loss to defendant in October 1992, with a supplemental proof on loss on November 17, 1992, but the insurer had arbitrarily refused either to pay the claim within the period specified by La.R.S. 22:658 or to tender unconditionally an amount reasonably due in satisfaction of the claim. Bennett sought to recover not only the damages it sustained from the fire but also statutory penalties and attorney's fees.
In answer, SCIC alleged the fire was of incendiary origin and still under investigation, so that the statutory 30-day period to pay the claim had been suspended. Contending the fire was the result of an intentional act, defendant asserted the intentional act exclusion of the policy would void the policy if the investigation should determine the fire was arson. In a supplemental and amending answer, defendant denied coverage based on the affirmative defenses of arson and material misrepresentation. SCIC also raised exceptions of no cause of action and prematurity, which were overruled, and filed a motion for summary judgment, which was denied.
In a 1995 supplemental and amended petition, plaintiff alleged the arson investigation by both federal and local authorities had been closed in approximately June 1993 without arrest of any person connected with Bennett, yet defendant continued in its refusal to pay plaintiff's claim.[1]
The case first came up for trial by jury in January 1995, but was halted when the court granted a mistrial.[2] Ultimately the case was tried before a jury from August 21 through September 15, 1995. The jury returned a verdict in favor of plaintiff, making the following findings on jury interrogatories: (1) No one connected with Bennett had wilfully concealed or misrepresented any material facts concerning the insurance claim with intent to deceive or defraud the insurer. (2) The fire was not a purposely set fire and no one connected with Bennett was responsible for setting it. (3) Bennett was entitled to $276,000 for loss of inventory, $69,000 for lost profits, and $3,000 for moving expenses, for a total of $348,000. (4) SCIC did not fail to adjust the claim fairly and promptly or fail to make an effort to settle the claim and its conduct was not unreasonable. (5) SCIC's conduct in failing to pay the claim within 30 days as provided by law was arbitrary and capricious and as penalties for that conduct Bennett was awarded $34,800, plus attorney's fees of $50,000.
SCIC filed motions for judgment notwithstanding the verdict and for new trial, which were denied.
SCIC has appealed, contending that the jury was clearly wrong in its fact determinations. SCIC asserts the evidence proved that the fire was intentionally set, that the insured was responsible for setting the fire, and that SCIC was not arbitrary and capricious in the handling of this claim. SCIC argues that in the absence of believable rebuttal evidence, financial motive along with incendiary origin is sufficient to sustain the affirmative defense of arson by the insurer, even if the plaintiff denies any wrongdoing and, further, that poor financial condition is evidence of motive in setting the fire. As to the award of penalties and attorney's fees, SCIC asserts La.R.S. 22:658 is penal and must be strictly construed, so that penalties should not be applied if the insurer has a reasonable basis to defend against the claim. Further, appellant contends an insurer's refusal to pay is not arbitrary or capricious when serious issues exist as to plaintiff's right to recovery.
In response, Bennett contends that the jury verdict of no arson is overwhelmingly supported by the evidence, that there is insufficient evidence to demonstrate that anyone *1261 acting on behalf of plaintiff was responsible for the fire, and that the record strongly supports the jury's finding that SCIC was arbitrary and capricious. Bennett also contends the appeal is frivolous and requests us to impose sanctions on SCIC for frivolous appeal.

EVIDENCE
Trial of this matter consumed four weeks and resulted in an appeal record of 3,800 pages, 2,400 of which is transcript. Early in the trial the parties entered the following joint stipulations in the record: A fire took place at the warehouse leased by B. Bennett Manufacturing Company, Inc. in Jefferson Parish on September 21, 1992. On the date of the fire South Carolina Insurance Company had in full force a policy of insurance covering B. Bennett for loss due to fire, the terms and provisions of which are defined in the policy. SCIC hired Ken Cambre as an independent adjuster to investigate the fire. SCIC authorized Cambre to hire M.F. Bank and Company to determine what was damaged and make an inventory. M.F. Bank issued a report. M.F. Bank's report was forwarded to SCIC by Cambre. SCIC was informed by both the Jefferson Parish Fire Department and the Bureau of Alcohol, Tobacco and Firearms that their files were closed on or before June 16, 1994.
The testimony established that a fire occurred in the warehouse of B. Bennett Manufacturing Co., Inc. on September 21, 1992. Bennett, a closely-held corporation owned by several members of the Katz family, was in the business of selling school uniforms and work shirts to retail stores. Bennett's Harahan warehouse and offices were in a larger building which also housed other businesses. Bennett shared common walls with Lucas Oil Company and Metairie Air Conditioning.
On the day of the fire Bennett's chief executive officer, Stephen Katz, left the company offices with employees Frankie Quin and Mary Napolitano at approximately 4:00 or 4:15 p.m. Quin activated the burglar alarm and either Quin or Napolitano locked the front door. In the adjoining businesses, Jim Terrio of Lucas Oil closed his office for the day at approximately 5:10 p.m., while Frank Fugetta of Metairie Air Conditioning arrived at his office at approximately 5:10-5:15 p.m. Within 10 minutes Fugetta heard "popping" noises, which sounded to him like stored light bulbs breaking. When he went out to investigate, he saw smoke coming out of the Bennett overhead door. He reported the fire on his cellular phone because he discovered his office telephone was not working.
When firefighters arrived they noted smoke coming only from Bennett. They found the building locked, so they entered by breaking the glass front door of the Bennett office and by forcing entry through the rear overhead door. They found flames concentrated in the northwest corner of the Bennett warehouse and proceeded to douse the fire with water. Various firefighters who were involved testified that the common wall between Lucas Oil and Bennett apparently was intact prior to the fire, but either was torn down during the overhaul stage after the fire was extinguished or was knocked down by fire hoses during the fire. The portion of the wall that was torn down had metal studs with sheetrock on both sides.
None of the firefighters could pinpoint when or by whom the wall was torn or knocked down. They saw no fire in the Lucas Oil section or in the Bennett offices. During the overhaul process the firefighters discovered a space heater in the northwest corner of Bennett's warehouse. At that point they immediately sealed off the area and called for an arson investigator.
After the fire Bennett moved its offices, equipment and stock to another location, supplied by its landlord but having less square footage. On November 17, 1992 Bennett filed a Proof of Loss with SCIC, seeking payment of losses it calculated at $500,000 (including $398,345 in inventory). Meanwhile, on October 29, 1992 Stephen Katz, on behalf of Bennett, signed an agreement selling the "existing B. Bennett inventory, trademark, tradenames and brands" to Camco Manufacturing, Inc., an Arkansas company. The agreement had an effective date of October 12, 1992.
*1262 Although the Camco deal had been in negotiation since January 1991, Katz did not mention it to SCIC when making Bennett's claim. Katz notified Bennet's school uniform buyers by letter in December 1992 that Bennett was discontinuing the school uniform business. In addition, Katz told both Jack Higgins, his sales manager, and Cleland Powell, his banker, that he was going out of business in October 1992. He did not notify SCIC of that fact, however.
SCIC relied on the above information to support its defense that insured made material misrepresentations on the proof of loss and in Katz's examination under oath. An additional basis for the claim of material misrepresentation was the stock inventory produced at Napolitano's deposition, which was erroneous because it listed only the school uniforms and not the work shirts, it contained duplications, and the figures in it did not add up to the listed total.
Tom Lowe, arson investigator for the Jefferson Parish Fire Department, was accepted as an expert in the origin and cause of fires. He testified that the fire's point of origin was concentrated where the school uniforms were stored. There was low-level burning in the warehouse near the point of origin. He found no heat source except the space heater in the back of the warehouse where the fire was believed to have begun. No electrical wiring was found in the aluminum stud wall between Bennett and Lucas Oil. There was no fire damage in Lucas Oil's quarters, only soot on the walls and heat damage to product containers. He found no evidence of burglary or vandalism.
Lowe testified the space heater was found set on "high" in the back of the warehouse and plugged in to an outlet on the wood stud wall. He found heavy burning up the south-side aisle and heavy spalling in the aisle at what he described as the point of origin.[3] Lowe stated that spalling is usually associated with the use of an accelerant. The metal racks on which clothing was stored were distorted, with a V-pattern going down to where he opined an accelerant had been poured. The underside of some of the plywood shelves of the racks had been burned, which Lowe stated indicated an accelerant had run along the concrete floor and under the racks. He determined that the area of origin was the section against the south side aisle closest to the center rack.
Lowe noted there was little flame damage to Metairie Air Conditioning and no flame damage to Lucas Oil or to the Bennett offices. He determined the warehouse's electrical panel did not cause the fire. In his opinion, a liquid accelerant had been poured under the racks into a protected area. He felt the accelerant could not have been tracked from the Lucas Oil side into Bennett's side by firefighters. He also testified that a sample he took from under one rack tested positive under laboratory analysis for an accelerant.
Lowe stated he had eliminated all other possible causes for the fire: There was no wiring in the aluminum stud wall; the microwave oven found on the Lucas Oil side of the wall was not plugged in. There was no spalling on the Lucas Oil side. (He concluded that concrete damage in Lucas Oil had been caused by tools, which was confirmed by Jim Terrio, who said the damage predated the fire.) There was no evidence of burglary, vandalism or revenge. Lowe concluded that the fire had been purposely set and that it was arson for profit.
Lowe also called in the federal Bureau of Alcohol, Tobacco and Firearms (ATF) to assist in investigation of the fire. ATF Special Agent Robert Jamison testified he interviewed all Bennett employees within two days of the fire and that he was told by Frankie Quin that the locks had been changed after a former employee left several years previously.
Although Lowe testified on direct examination that the heater was found plugged in, he admitted on cross examination that he only assumed the heater was plugged in. He also assumed that a wire that was found *1263 attached to an outlet had been attached to the heater. However, the wire attached to the heater was not attached to the wall outlet wire when Lowe first saw it, nor did anyone tell him they saw it attached. He could not recall who first showed him the heater.
On a diagram drawn during his original investigation, Lowe had placed the heater some distance away from the locus of the fire. He admitted that if the heater were in the place where he had drawn it, it could not be the ignition source. He also took three photographs of the heater in three different locations. One of the pictures was supposed to depict where the heater was found. However, another picture of the same spot, which Lowe identified as having been taken before anything was moved, did not show the heater. There was no explanation of how the heater could have been found there if it could not be seen before anything was moved. Nor did Lowe explain why he failed to take a picture of the heater in its original situation.
In a series of questions under cross examination, Lowe admitted it was possible that polyester-containing clothing on the racks may have been on fire, fallen, and landed on the concrete floor, releasing heat as it burned and thus heating that area of the floor hotter than the surrounding area. Lowe disagreed with this theory; he felt the shape of the spalling marks indicated a "pour pattern," indicative of an accelerant being poured on the floor. Further, he did not believe polyester would produce as much heat as accelerant, but admitted he had not tested the polyester-based pants from the scene of the fire. Further, plaintiff presented evidence that plastics and hydrocarbons all burn at the same temperature.
In addition, Lowe was forced to admit that he had erred on the question of temperature in other respects. He confused the temperature it would take to bend metal (regarding the twisted metal studs in the Bennet-Lucas common wall) and the temperature it would take to melt metal. He concluded the fire's temperature must have been 2600 degrees (which he felt was positive proof of accelerant use), but later had to admit he was wrong.
Lowe was presented with portions of the National Fire Protection Agency fire investigation guide, which he acknowledged is a recognized guide, which contradicted some of his conclusions: "[F]lame temperatures achieved by all hydrocarbon fuels (plastics and ignitable liquids) and cellulostic fuels are approximately the same." NFPA 921, Fire and Explosion Investigations (1992), section 4-8.1. "[W]hile spalling does involve high rates of heat release or rapid rise in temperatures, accelerant need not be involved at all. The primary mechanism of spalling is the expansion or contraction of the surface while the rest of the mass expands or contracts at a different rate." NFPA 921, Fire and Explosion Investigations (1992), section 4-6. In addition, the NFPA guide established that steel could bend at a much lower temperature (1000 degrees). NFPA 921, Fire and Explosion Investigations (1992), section 4-9.
The effect of these admissions was to present the jury with a reasonable theory other than an accelerant to explain the presence of spalling. The jury was able to view the shape of the spalling marks in the photographs in evidence. Evidently they determined the marks could have been made by falling, burning clothing or by extinguishment water being poured on the concrete. Further, the factual errors made by Lowe cast doubt on his veracity as an expert.
Captain Louis King testified he was the fire fighter who found the heater. He stated it was in the northwest corner of the warehouse, on the floor about five to eight feet from the front wall. He could not tell whether it was plugged in. He also testified he saw no wiring in the metal stud wall between Bennett and Lucas. He saw no heat source other than the heater. Ike Mayfield testified he was the first fire fighter onto the premises; the clothing in the warehouse was burning from bottom to top in some areas, in others it was just burning in the middle or had different parts burning totally. He saw black wires near the back wall. Fire Fighter Michael Pittman testified he saw a fuse box, outlet and wiring on one wall stud.
Frank Fugetta, owner of Metairie Air Conditioning, which adjoined Bennett's warehouse, testified that the day of the fire was a warm day, like summertime. He stated he *1264 has two space heaters at his business and that he had turned on one of them on a warm day in the past, but found it did not come on. Although there was no evidence to indicate that the heater owned by Fugetta was the same type or functioned like the heater found in Bennett's warehouse, the jury may have taken Fugetta's testimony into consideration. In addition, Fugetta testified that before he discovered the fire he heard a noise that sounded to him like an electrical fire, "like some kind of shortage condition electrically." He said he recognized the noise because he has done electrical work all his life.
Robert Alonzo, accepted by the court as an expert in cause and origin of fires, testified he was hired by SCIC to investigate the fire. When he examined the scene two days after the fire he found that the Bennett office had suffered no fire or heat damage, but that the heavy flame damage was centered near the west wall of the warehouse. He found spalling on the aisle near the west wall, deformation of the steel racks in the same area, and structural steel damage and spalling in protected areas. The front of a pallet against the Lucas Oil wall showed heavy charring on the side facing the Bennett warehouse, which he stated indicated a very low fire.
Alonzo stated the fire started very low on a concrete floor with no evidence of any heat source other than the electric heater found there. He concluded the burn patterns indicated use of a liquid accelerant. The nearest electrical circuit was on the wooden-stud wall and there was no wiring in the aluminum-stud wall. There was no fire damage on the Lucas Oil side, and the electrical receptacle on the wooden-stud wall had only exterior heat damage. Further, he testified, soot patterns indicated the top outlet of the receptacle had something plugged into it at the time of the fire.
Alonzo stated that the electrical system showed no evidence of short circuit or any problems. He said if there had been a hole or other opening in the common wall with Lucas before the fire, there would have been substantial fire damage to both sides. He found no evidence that any Lucas Oil product had leaked through the wall into the Bennett warehouse. Jack Higgins told him that only four employees had keys and the alarm code for access to the premises, that Bennett recently had lost two major customers, and they had a lot of school uniforms left over at the end of the sales season. Alonzo also noted that Bennett's inventory of work shirts was not near the point of origin. The damage was confined almost entirely to the stock of school uniforms.
On cross-examination, however, Alonzo admitted that all the samples he took tested negative for accelerant. He felt the reason for the negative readings was that he did not have the right tools with him. He concluded the fire was arson because there was spalling, ghost marks, accelerant, sheen, a protected area, a heater, a low burn pattern, and no normal ignition source. Although he mentioned in his report that there was a high temperature, he did not refer to the temperature on direct examination at trial. Under cross-examination, however, he admitted that he had erred in his assessment of the probable heat of the fire, as Lowe did. (Like Lowe, he was using the melting point rather than the bending point of metal as the likely temperature.) He admitted he was in the courtroom when Lowe was confronted with the temperature mistake, so he was aware of his own error before he was cross-examined. He also admitted he knew the NFPA 921 guide warns arson investigators not to make the same mistake he had made with the temperature needed to bend versus melt steel.
Alonzo also admitted that if water hit the floor before the burning clothing fell on it, the water could have caused the spalling. His analysis of the scene, however, assumed that the clothing fell on the floor first and insulated it when the extinguishment water later was sprayed on by the firefighters. Nevertheless, there was no evidence that the clothing was already on the floor when the water was first applied to the fire scene. There was testimony that the pressure of water from fire hoses is very strong, strong enough to have knocked clothing off the racks onto the floor. There also was testimony that the firefighters knocked things over and looked under the burned clothing *1265 during the overhaul procedure to make sure there was no fire left. Alonzo admitted eventually that hypothetically all the spalling could have been caused by the extinguishment water. It appears the jury rejected Alonzo's opinion that the floor was covered before the water was sprayed on it.
Like Lowe, Alonzo failed to test-burn the polyester pants that had been burned in the fire. He also failed to research the properties of burning polyester, so he had no idea what temperature or residue would be left by burning polyester pants. He admitted that a portion of the polyester clothing was an oil product.
Alonzo also relied on the presence of the heater as the likely ignition source. He stated the only other possibility would be a timing device or fuse, but there was no evidence of a fuse. He did not know where the heater was prior to the fire and he admitted the heater could have been moved around substantially by the water pressure from a fire hose. He could not say whether it was plugged in at the time of the fire; if it was not plugged in, he agreed, it could have had nothing to do with the fire. He acknowledged he had no proof the heater was the ignition source.
Alonzo assumed there were no wires in the common wall, which ignored the testimony of firefighter Mayfield, who saw black electrical wire by that wall. Alonzo also assumed there was no fire damage on the Lucas Oil side of the wall. However, photographs of the scene on the Lucas side of the wall showed the microwave oven was badly burned, as well as burned cartons and melted product containers.
Both Lowe and Alonzo mentioned seeing a sheen on the extinguishment water standing on the floor, which they deduced was left by an oil-based accelerant. Jim Terrio, the Lucas manager, testified there was oil all over the floor after the fire. That would account for the water sheen noted by Lowe and Alonzo. It also supports plaintiff's theory that the petroleum-based substance that produced the positive result on one of the ATF samples was Lucas product tracked onto the Bennett side by firefighters in the aftermath of the fire.
Alonzo further assumed there was no electrical problem because none of the circuit breakers were tripped. However, there was no evidence regarding any action the firefighters may have taken with the circuit box, although Alonzo admitted the first thing firefighters do when they arrive at a fire scene is to cut off power at the main breaker. He also admitted that a fault in the main line would not cause the breaker to trip either on the Lucas side or the Bennett side.
George Hero, plaintiff's expert, was accepted by the court as an expert in electrical engineering, mechanical engineering, and the cause and origin of fires. He first looked at the site in December 1993. By that time the damage from the fire had been repaired. Most of his evaluation was based on contemporaneous photographs of the scene taken by Lowe and others, as well as review of Lowe's and Alonzo's reports and the depositions of the firefighters.
It was Hero's opinion that the fire was electrical and originated in Bennett's common wall with Lucas Oil. He theorized there was an electrical event which caused a momentary power loss, so that the alarm system sensed a power failure, but power was restored before the system could dial in to the central monitoring system. Thus, by the time the call was made the system reported only a power restore. Then it immediately reported a burglary, which he deduced indicated it detected smoke or fire, since it was an infrared alarm. Neither Lowe nor Alonzo considered the electrical interrupt signal received by the alarm company.
Hero stated that the burn pattern and the natural behavior of fire indicated an electrical event in the common wall. Because there was a microwave oven on the Lucas side of the wall, he concluded there must have been an electrical outlet nearby. He said the burn pattern on the common wall was that a wall with a one-hour fire rating failed in a fire that took place in half an hour. He concluded the fire must have broken through the wall into the Bennett side. There was limited fuel in the wall on the Lucas side so that, by the time firefighters arrived, there was not much fuel to burn. He said the firefighters *1266 did not have to do much work on the Lucas side. He believed the fire had traveled under the wall from Lucas to Bennett, in a gap between the sheetrock and the slab floor.
Hero noted the wall is a metal-stud wall with sheetrock on both sides. Under the building code it had a one-hour rating, yet the photographs show it was violated and penetrated and the metal studs were badly burned and twisted. He said a fire on one side of the wall would not have caused that type of damage in a one-hour wall from 5:28 p.m., when the call was made, until the firefighters arrived approximately 17 minutes later. Hero believed something had to have happened in the wall to prevent it from having the rating it should have had.
He pointed out that on the adjacent wooden-stud wall, the sheetrock protected the wood studs well, yet the same sheetrock did not protect the metal studs. Based on that evidence, he concluded there must have a problem within that wall. He pointed out that photographs showed the studs in the wood-stud wall where it joined the metal-stud wall show the wooden studs and wall receptacle were clean, with no evidence of heat. On the metal-stud wall, however, the studs were twisted and rusty, showing they got hot enough to remove the galvanization on them. He said the difference indicates that something happened inside the wall.
Hero testified there are several reasonable explanations for the spalling found underneath the protected area. The racks had plywood shelves, with an airspace under the bottom. If there were a pair of pants in that area when a fire plume went up, there would be fairly intense heat underneath that shelf area. Another explanation is that due to the heat of the fire and the heat of the slab, when firefighters came with water the cement popped up. Hero also noted that he found spalling on the Lucas Oil side of the wall, which is consistent with the testimony of Captain King and also indicates fire on both sides of the wall. This contradicted Lowe's and Alonzo's statements that there was no spalling on the Lucas side of the wall.
Gladys Scott, the claims supervisor for SCIC, testified that the insurer did not learn of the Camco deal or Bennett's withdrawal from the school uniform business until Katz's examination under oath in March 1993. She pointed out that Katz wrote letters to SCIC stating that he was paying $800 in rent, that Higgins' salary at the time of the fire was $4,000 per month, and that he believed he could put his business back on line within six to twelve weeks after the fire. At trial, however, Katz admitted that Bennett was not being charged rent when he wrote those letters. He also admitted that Higgins' regular salary was not $4,000 a month, but stated that Higgins sometimes earned that much in months with high commissions.
Scott also testified that Katz claimed Bennett's business records were in ashes, but SCIC learned subsequently that those records had been moved from the Edwards Avenue office after the fire and had been stored at Katz's Loyola Avenue office in New Orleans.
Holly Sharp, accepted by the court as an expert CPA, certified financial planner, and certified frauds examiner, testified she was hired by SCIC's attorney to review the records of B. Bennett Corporation. She said the records were not "in ashes" or even firedamaged, but were in normal condition. She stated the records showed that at the time of the fire Bennett's sales had been declining seriously in both the work shirt and the school uniform lines, its inventory had been rising, the amounts owed on its Whitney Bank line of credit had been rising, and it was in a poor cash position.
Sharp testified that between September 1988 and September 1992, sales of school uniforms had dropped from $577,000 to $195,000. Between September 1990 and September 1992 sales of work shirts declined from $451,000 to $302,000. Further, in September 1990 the inventory was listed at $228,000 as Bennett's cost. In September 1992 it was $343,000. In the best sales year in the period 1987-1992 the inventory was only $170,000. Further, the notes payable to the Whitney Bank had increased from zero in September 1989 to $150,000 in September 1991 and 1992. By September, sales of school uniforms were finished; therefore, the *1267 company should have had the most cash to pay off the loan by the end of September. The average cash balance for January through August 1989-1992 was slightly positive, but in January through August 1992 there was a negative cash balance.
Sharp testified that to continue paying Steve Katz his $90,000 as CEO, while also paying off the Whitney Bank loan, the company would have needed annual sales between $1.4-2.4 million in 1993. The company's sales were never that high even in its best year.
Sharp also pointed out that the company's orders for piece goods for future products had dramatically decreased in 1992. By September of every year from 1987 through 1991, the company had ordered at least $100,000 in piece goods. By September 1992, it had ordered only $14,000 in piece goods. Further, the records showed there was no fabric remaining to be worked at the factory in Honduras that manufactured the school uniforms.
Sharp testified that nothing in the financial records supported the $500,000 claim made by Katz. The inventory done by the salvage company after the fire showed a total of $394,000 in stock "at selling price," while the company's cost for the goods was $249,000 to $288,000. Subtracting the amounts for retained goods and salvage value, the remainder totaled $186,000 to $214,000.
On cross examination, however, Sharp admitted that the cash-on-hand for September 1992 was almost the same as in September 1991; that the notes payable in September 1992 were exactly the same as the previous year; and that during 1990, the loans had reached a higher amount than in either 1991 or 1992. Further, she stated that three weeks before the fire Bennett had $25,000 on its loans to Whitney Bank and had paid an additional $25,000 on the day of the fire. Overall, Bennett had paid less interest on loans in 1992 than in the preceding year.
Sharp's opinion of Bennett's financial trouble was based on her conclusion that at the time of the fire Bennett had a higher inventory than it had had at that point in any previous year. However, at trial she was shown an inventory from July 1991, which showed $200,000 more in merchandise in the warehouse than was there at the time of the fire. She stated she had not been given that inventory to review in preparing for trial.
Sharp also noted that the records disclosed that Steve Katz had loaned Bennett $200,000 after the fire. She admitted that loaning the business that amount of money would make no sense if the company were in financial trouble. Further, Sharp's analysis of the decline in sales in 1992 did not take into account the pending sale of the work shirt division to Camco. She agreed, however, that it would be appropriate to add in the $179,000 Camco deal to her total.
Sharp also testified on direct examination that the school uniform business was declining, but that determination was contradicted by testimony of Gloria Avila, who formerly was the soft goods buyer for the Schwegmann supermarket chain and who had bought from Bennett for several years. Avila stated that the school uniform business is one of the fastest growing business in the nation because many states have made uniforms mandatory in public schools. In addition, Jack Higgins testified that since leaving Bennett had he been selling school uniforms exclusively and that business was excellent.
Stephen Katz testified that after he left the Bennett office on the day of the fire, he went to a nearby Kmart store to buy some flowers, then to the hospital to visit his ailing father-in-law. Between Kmart and the hospital he stopped at his in-laws' apartment to pick up some medication for his father-in-law. While at the hospital he received a telephone call from his wife notifying him that the warehouse burglar alarm had gone off and, subsequently, a call from Jack Higgins, the company sales manager, advising him there was a fire in the building. He was questioned closely by defense counsel regarding the time sequence of his activities after he left work, in an attempt to imply that he had time to return to the Bennett offices and set the fire.
Katz denied setting the fire or having anyone set it for him. He stated he had nothing to do with it except to clean up after it. He felt it was a naturally-occurring fire of electrical *1268 origin. He said he was told that on the night of the fire, but could not recall who gave him that information.
In response to Gladys Scott's claim that he deceived the insurer about the existence of business records, he explained that the fire damaged files kept in the loft. When retrieving them, they did not put the salvaged records in order, they just threw them in boxes to store them. Further, after he sent his proof of claim he was under the impression the insurance company had all the information they needed. They did not ask for anything else. He gave counsel for SCIC carte blanche not only to look at and to copy the stored records, but also to talk to his banker. If he had known the insurer was planning to deny his claim, he would not have permitted the salvage company to remove the fire debris without first getting someone to investigate on his behalf.
Katz stated they carried school uniforms in stock all year as a marketing advantage, to service their customers. He said the uniform inventory placed in evidence was pretty standard. He acknowledged the disadvantage of maintaining a large stock is that it ties up a lot of money, but the advantage is being able to service customers.
He admitted that uniform sales had been down around the time of the fire. He had made moves to curtail the situation. He had been living out of town and running the business by phone, but there were big changes in the school uniform business. He decided to come back and "get serious about it." Due to the fire, however, they lost their existing inventory. Since they usually had to place orders for uniforms to be made after the back-to-school season, they needed to get the orders in by October. Thus, they needed a cash advance by October; the fire occurred at the worst time for his business.
Katz testified he did not mention the Camco deal in his March 1993 examination under oath because it was a business negotiation more than a month after the fire and wasn't directly connected.
At the time of the fire Katz was receiving an annual salary of $90,000 from Bennett, in addition to income from his private investment activities. His net worth was in excess of $1,800,000. He was the only one of the family stockholders who had access to the company premises. The other stockholders had no involvement in running the business, nor did they draw any income from it.

LAW
In denying coverage SCIC relied on the policy's intentional act and material misrepresentation clauses, which provide in pertinent part as follows:
This insurance does not apply to:
a. `Bodily injury' or `property damage' expected or intended from the standpoint of the insured.
(Exh. P-1, Insurance Services Office, Inc., Businessowners Liability Coverage Form, BP 00 06 06 89 at page 2 of 12, section B, "Exclusions".)
This policy is void in case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
1. This policy;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this policy.
(Exh. P-1, Insurance Services Office, Inc., Businessowners Common Policy Conditions, BP 00 09 06 89 at page 2 of 3, section C, "Concealment, Misrepresentation or Fraud.")
La.R.S. 22:658 provides that insurers shall pay the amount of any claim due any insured within 30 days after receipt of satisfactory proofs of loss from the insured. In addition, the insurer's failure to comply with this provision can expose the insurer to additional damages owed to the insured:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1)... when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, *1269 or one thousand dollars, whichever is greater ... together with all reasonable attorney fees for the prosecution and collection of such loss....
(2) The period set herein for payment of losses resulting from fire and the penalty provisions for nonpayment within the period shall not apply where the loss from fire was arson related and the state fire marshal or other state or local investigative bodies have the loss under active arson investigation. The provisions relative to time of payment and penalties shall commence to run upon certification of the investigating authority that there is no evidence of arson or that there is insufficient evidence to warrant further proceedings. [Emphasis added.]
La.R.S. 22:658(B).
In addition, the law imposes on insurers a duty to investigate and settle claims in good faith:
A. An insurer ... owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
* * * * * *
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. * * *
LSA R.S. 22:1220(A)-(B).

Arson
A denial of liability based on arson by a fire insurer sued on a fire insurance policy is an affirmative defense. Chisholm v. State Farm Fire & Casualty Co., 618 So.2d 1059, 1062 (La.App. 1st Cir.1993). The insurer bears the "burden of establishing, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. An insurer need not prove its case beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense." Rist v. Commercial Union Insurance Co., 376 So.2d 113 (La.1979). "Proof of motive plus establishment of the incendiary origin of the fire, in the absence of credible rebuttal evidence, is sufficient to sustain the affirmative defense of arson." Chisholm, 618 So.2d at 1062.
Arson also may be proved by circumstantial evidence. The insurer need not prove its case beyond a reasonable doubt; its circumstantial evidence need only exclude every other reasonable hypothesis than that the plaintiff is responsible for the fire. Sumrall v. Providence Washington Ins. Co., 221 La. 633, 60 So.2d 68, 69 (1952); Christensen v. State Farm Mut. Auto. Ins. Co., 552 So.2d 1377, 1378 (La.App. 5 Cir.1989), writ denied, 558 So.2d 572 (La.1990). Whether the insurer has adequately proved the arson defense is a factual determination. Del-Remy Corp. v. Lafayette Insurance Co., 616 So.2d 231, 234 (La.App. 5th Cir.), writ denied, 617 So.2d 941 (La.1993). See also, Miley v. U.S. Fidelity and Guar. Co., 94 1204 (La.App. 1 Cir. 4/7/95); 659 So.2d 792, 794.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Stobart v. State, through Dept. of Transp. and Development, 617 So.2d 880, 883 (La.1993). In Stobart, the supreme court made a definitive statement cumulating years of pronouncements on the manifest *1270 error rule, beginning with the two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Thus, a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findingthe court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. * * * Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. * * * However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. * * * Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" * * *
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." * * * Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. [Citations omitted.]
Stobart, supra.
Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. * * * For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. * * * If the opinion is based upon facts not supported by the record, the opinion may be rejected. [Citations omitted.]
Rogers v. Roch, 95-242 (La.App. 5 Cir. 10/18/95); 663 So.2d 811, 817-818.
Reviewing the jury's findings on arson and the culpability of Bennett, we are unable to find manifest error. The jury's conclusions on the evidence were reasonable. The theories posited by plaintiff's expert had as much validity as the theories posited by the defense experts. Further, although Sharp's testimony regarding the company's financial condition may be evidence of motive, the jury obviously found Katz's testimony credible rebuttal evidence. That determination was the province of the factfinder and we find no ground to disturb it.

Material Misrepresentation
Although appellant has not briefed the material misrepresentation issue specifically, its frequent references in its brief to information officially furnished to SCIC by Katz which SCIC later determined was erroneous indicates the issue is before us on appeal. "Misrepresentations in a proof of loss will void coverage `only if the insured knowingly and intentionally makes such misrepresentations with the intent to deceive and defraud the insurer. Fraud will never be presumed from acts which may be accounted for on the basis of honesty and good faith.'" First Guar. Bank v. Pelican State Mut. Ins. Co., 590 So.2d 1306, 1308-1309 *1271 (La.App. 1 Cir.1991). The jury determined the plaintiff made no willful concealment or material misrepresentation of any material fact or circumstance concerning the insurance claim with intent to deceive or defraud defendant. We find no manifest error in that conclusion.

Penalty and Attorney's Fees
"A trial court's conclusion as to assessment of penalties and attorney's fees under La.R.S. 22:658 is in part a determination of fact and may not be disturbed in the absence of manifest error. * * * An insurer's refusal to pay is not arbitrary, capricious, or without probable cause where serious issues regarding the plaintiff's right to recovery are raised." Gardiner v. Old Hickory Cas. Ins. Co., 529 So.2d 1324, 1328 (La. App. 5 Cir.1988).
SCIC was justified in withholding payment while the matter was under official investigation, pursuant to La.R.S. 22:658(B)(2). However, the parties stipulated the law enforcement authorities notified SCIC in June 1994 that their files were closed. At that point the insurer was required to pay the claim. The wording of the statute leaves no leeway on that point.
Plaintiff has pointed out, further, various instances which indicate the insurer was arbitrary in its decision not to pay: SCIC had tests performed on the Lucas Oil products, but the test results were never given to SCIC's own experts, nor were they presented at trial. Gladys Scott admitted she told the state insurance commissioner she would pay the claim when the arson investigation was closed by the law enforcement agencies, but she never paid the claim. SCIC ignored the opinion of George Hero, given to them prior to conclusion of the government agencies' investigation in 1994, that the fire was not arson. SCIC did not provide the July 8, 1991 inventory to its financial expert, Holly Sharp, although that inventory had been provided to SCIC's local selling agent on July 8, 1991, so SCIC clearly had access to it. SCIC's position that the school uniform business was declining, and which was set forth in Sharp's testimony as a motive for arson, was contradicted by several witnesses who were intimately familiar with the retail clothing business. SCIC failed to tell plaintiff timely that it was anticipating litigation and was denying the claim. Further, neither of SCIC's fire experts tested the polyester clothing, yet Gladys Scott testified the company hired an expert to test the polyester. Those test results were not presented, either to the expert witnesses or to the jury.

CONCLUSION
Considering the foregoing, we are unable to find the jury was clearly wrong in its determinations. In a technical trial such as this, the testimony often is more a "battle of experts" than anything else. It is plain not only that the jury found plaintiff's expert more credible, but also that the defense experts were shown to have based many of their conclusions on inaccurate and/or incomplete information. We cannot fault the jury for believing the plaintiff's expert over the defense experts in this case. Similarly, the finding that SCIC was arbitrary and capricious in its refusal to pay is a factual determination that was not unreasonable on the evidence before the jury.
As for Bennett's urging that we impose sanctions for frivolous appeal, Bennett's failure either to cross-appeal or to answer the appeal precludes us from considering that argument. La.Code Civ.P.Arts. 2082, 2133.
For the foregoing reasons, the judgment is affirmed. The appellant is cast for all costs.
AFFIRMED.
NOTES
[1] During trial of this matter, the parties stipulated that SCIC was informed by both the Jefferson Parish Fire Department and the federal Bureau of Alcohol, Tobacco and Firearms that their files were closed on or before June 16, 1994.
[2] The trial court later granted SCIC's motion for its costs and attorney's fees incurred for the aborted trial. The court found the mistrial was attributable to impermissible questioning of a witness by Bennett's counsel which violated the court's instructions. The court awarded SCIC attorney's fees of $6,328.75 and costs of $2,902.80, with interest from original date of judicial demand until paid. There was no appeal taken from that ruling.
[3] "Spalling" is damage to a concrete surface caused by the expansion or contraction of the surface while the rest of the mass expands or contracts at a different rate. Because it involves high rates of heat release or rapid rise in temperatures, spalling is a factor that is considered in evaluating fire scenes for evidence of accelerant-induced arson.